***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff was employed by the Defendant-Employer on January 29, 2003. As of that date, the Defendant-Employer had three or more employees in North Carolina. Valley Forge Insurance Company was the carrier. All three parties were subject to and bound by the North Carolina Workers' Compensation Act as of that date.
2. On January 29, 2003, the Employee suffered an injury by accident to his low back which arose out of and in the course of his employment with Defendant-Employer.
3. Plaintiff had an average weekly wage of $717.08, yielding a compensation rate of $478.08, as of January 29, 2003.
4. The Defendant-Carrier has paid the Plaintiff temporary total disability benefits of $478.08 from January 30, 2003 to the date of hearing before the Deputy Commissioner.
5. The following forms and documents have been submitted to the
Industrial Commission and shall be part of the record:
a. Form 19 dated February 3, 2003.
 b. Form 60 undated (unless the original on file with the Commission shows a date).
c. Form 22 dated February 19, 2003.
d. Form 62 dated March 11, 2003.
e. Form 18 undated, but filed on May 19, 2003.
 f. Form 24 application, together with attachment, dated October 8, 2003, and also supported by affidavit of Linda Kiesling, dated November 26, 2003, together with attachments.
 g. Plaintiff's response to Form 24, dated October 21, 2003, together with supporting affidavit by Plaintiff, dated October 21, 2003.
 h. Administrative Order by Robert J. Harris, Special Deputy Commissioner, filed December 8, 2003.
 i. Form 33 submitted by Defendants, dated December 11, 2003.
 j. Form 33R submitted by Plaintiff, dated January 20, 2004.
6. In addition, the parties stipulated into evidence a packet of medical records and reports. The packet was subsequently changed by stipulations submitted May 21, 2004, so that the packet totaled 103 pages, except that some of the medical records submitted at the hearing were deleted in that they related to a different patient.
7. The stipulations dated May 14, 2004, which were subsequently submitted by the parties, are also incorporated into the record.
8. The Pre-Trial Agreement dated February 5, 2004, which was submitted by the parties, is incorporated into the record.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The controversy in this case centers around whether Plaintiff returned to self-employment while receiving temporary total disability compensation after suffering an admittedly compensable back injury resulting in two surgeries. Defendants filed a Form 60 in addition to a Form 62 dated March 11, 2003.
2. As of the date of hearing before the Deputy Commissioner, Plaintiff was twenty-eight years old and had a GED. As of January 29, 2003, Defendant-Employer had employed him for approximately five years as a well driller, which required Plaintiff to maintain the well rig, and lift heavy casings, blocks and walk boards weighing fifty to one hundred and twenty pounds. Throughout his employment with Defendant-Employer, Plaintiff had had bouts of back pain. His back problems dated back to when he was in high school. On January 29, 2003, Plaintiff sustained an admittedly compensable injury by accident when he developed the sudden onset of severe back and leg pain as he was picking up some walk boards at a job site. Plaintiff notified Defendant-Employer that same day and was taken to Urgent Care and subsequently to the Lake Norman Regional Medical Care Emergency Room. After initial treatment at the Emergency Room, he was referred to Dr. Christopher G. Paramore, a neurosurgeon. Dr. Paramore examined him on January 31, 2003, prescribed medication and ordered an MRI. The MRI revealed congenital narrowing of the spinal canal at L4-5 and a small disc bulge, contributing to mild narrowing of the spinal canal at L5-S1.
3. Dr. Paramore then ordered an epidural steroid injection, which did not provide Plaintiff with significant relief. On February 14, 2003, Dr. Paramore recommended surgery. Plaintiff then saw Dr. Mark A. Lyerly, a neurosurgeon, on March 25, 2003, for a second opinion. It was Dr. Lyerly's impression that Plaintiff's primary problem was central canal and lateral recess stenosis at L4-5 and not the bulging disc at L5-S1, but he also recommended surgery. On April 22, 2003, Dr. Paramore operated to decompress the L4-5 interspace on the left side.
4. Following the operation, there was initial improvement in Plaintiff's symptoms on the left, but Plaintiff developed increased right leg pain. The MRI report itself indicated that there was diffuse congenital spinal stenosis in the lumbar spine and there was no disc herniation or spinal stenosis at L4-5, but there was an area of fluid collection at L5-S1 which could be a seroma, a hematoma or possibly an abscess. On May 7, 2003, Dr. Paramore examined Plaintiff and reviewed the MRI, which he interpreted as showing spinal stenosis caused by a combination of facet hypertrophy and a mildly bulging disc at the L4-5 level. By letter dated May 14, 2003, he recommended a second operation at L4-5 to decompress the nerve root on the right side.
5. Plaintiff underwent a second operation at the L4-5 level on June 10, 2003. The hospital records for the June 10, 2003 surgery were not placed into evidence, but Plaintiff testified he experienced considerable pain after the operation and stayed in the hospital for several days. After his discharge, Plaintiff symptoms initially improved, but on July 9, 2003, he returned to Dr. Paramore with complaints of back and bilateral leg pain. Dr. Paramore noted at the next office visit on August 13, 2003, that Plaintiff's complaints were in different areas than before either operation. He referred Plaintiff to a pain center.
6. On August 21, 2003, Plaintiff was seen by Dr. Paul K. Jaszewski of Southeast Pain Care, at which time Plaintiff rated his pain as "10 on a scale of 10" and described the pain as "sharp, aching, burning, tingling, throbbing and shooting." Further, he felt numbness in the morning and tried to get relief by changing positions or taking Percocet. Plaintiff stated that almost any type of activity made his pain worse. Dr. Jaszewski treated Plaintiff's symptoms with medication management until October 3, 2003, at which time Plaintiff underwent epidural injections. Following these injections, his examinations remained unchanged. On November 11, 2003, a caudal steroid injection was performed also resulting in no benefit.
7. Dr. Jaszewski treated Plaintiff until February 5, 2004, with narcotic pain medications, epidural steroid injections and a caudal epidural steroid injection. Plaintiff indicated that his pain was getting worse. Consequently, Dr. Jaszewski then referred him to Dr. David S. Jones for a third neurosurgical opinion. On February 25, 2004, Dr. David S. Jones of Carolina Neurosurgery Spine Associates saw Plaintiff. During the examination, Dr. Jones recommended a lumbar myelogram be performed in order to determine whether any additional surgery was needed. The myelogram was performed on March 4, 2004, and showed a disc bulge at L4-5. Dr. Jones wanted to see the CT portion of the myelogram before making any recommendations. As of the date of hearing before the Deputy Commissioner, Dr. Jones had not made any recommendations. Plaintiff testified that he understood Dr. Jones recommended a third surgery.
8. In the summer of 2003, Plaintiff's brother, Nathan Bolling, began living with Plaintiff's family. Nathan Bolling was unemployed and did not contribute to the cost of rent, food, utilities or automobile expenses. Both Plaintiff and his wife testified that they assisted Nathan Bolling because they were trying to help him get on his feet financially.
9. Nathan Bolling had previously worked in the drilling business for a number of years with Defendant-Employer. Based on his past drilling work experience, Nathan Bolling decided to start a well drilling business. Plaintiff's wife printed business cards for the new business, which was called Bolling Brothers Well Drilling (hereinafter Bolling Brothers). Wrights Properties hired Bolling Brothers to install a well at one of their locations in August 2003. Nathan Bolling and Plaintiff did not own a well drilling rig yet, so they hired Randy Davis as a subcontractor. Between early summer 2003 and August 2003, Bolling Brothers performed two jobs and contracted a third job. No one in Plaintiff's household received any compensation for the above-mentioned jobs, except for Nathan Bolling. The business is now closed.
10. The evidence reveals that Plaintiff was present at Bolling Brothers job sites on approximately August 11, 2003 and 12, 2003. During one of these visits, Plaintiff went to the drilling site and mostly stood around talking to the property owners about divining rods, went to Lowe's to pick up concrete, and drove his truck to pull another truck out of the mud. Plaintiff testified that going out to this site and one of Defendant's work sites helped to lift his spirits as he was tried of staring at the walls after his surgeries. Plaintiff, his wife and Nathan Bolling all testified that Plaintiff wanted to work with Nathan Bolling after Plaintiff recovered from the surgeries but was unable to do so because of his continued symptoms and treatment.
11. At the time of the hearing before the Deputy Commissioner, the Wrights thought that Nathan Bolling and Plaintiff had significantly overcharged them for the work done and had issues with Plaintiff arising from the amount billed.
12. Randy Davis and Louis Tallent also testified at hearing. Mr. Davis testified that both he and his assistant Tallent were present at the Bolling Brothers' job sites on August 11, 2003 and August 12, 2003. Mr. Davis is a well driller and owned the rig used at the job site. Mr. Davis did not observe Plaintiff perform any physical tasks associated with well drilling. He was aware that Plaintiff went to Lowe's to pick up concrete, and did observe Plaintiff get in his truck and pull the water truck out of the mud; however, Tallent and Nathan Bolling unloaded all of the concrete bags and hooked and unhooked the tow chain to Plaintiff's truck.
13. The Full Commission finds the testimony of Plaintiff, his wife and Nathan Bolling to be credible.
14. Defendants originally admitted liability for Plaintiff's injury pursuant to a Form 60, which was been filed with the Industrial Commission. On October 13, 2003, Defendants filed a Form 24 application to terminate or suspend compensation. After an informal hearing, an administrative order was filed finding that a decision could not be made based upon the informal hearing. Defendants then filed a Form 33 request for hearing appealing the decision and requesting a formal hearing. The Deputy Commissioner approved Defendants Form 24 request to terminate compensation.
15. Based on the greater weight of the evidence, the Full Commission finds that Plaintiff cannot return to his pre-injury job and has not returned to wage earning capacity. The duties Plaintiff performed in his brother's business are not indicative of an ability to earn wages in the competitive job market. Specifically, visiting drilling sites while mostly standing around and talking to the property owners about divining rods on one or two occasions, going to Lowe's to pick up concrete on one occasion, and driving his truck to pull another truck out of the mud on one occasion, are not indicative of a return to wage earning capacity.
16. Although there does not exist direct evidence in the medical records that Plaintiff cannot return to his pre-injury job, based on his restrictions, the Full Commission finds that Plaintiff has been incapable, since his injury, of earning the same wages he earned before his injury in the same employment and has been incapable, since his injury, of earning the same wages in any other employment. Plaintiff's incapacity to earn wages is the direct result of his admittedly compensable injury that resulted in two surgeries.
17. Subject to Defendants' credit for compensation already paid, Plaintiff is entitled to temporary total disability benefits subsequent to January 29, 2003, and continuing until he returns to work or until it is otherwise ordered by the Industrial Commission.
18. Plaintiff is entitled to any medical treatment which may effect a cure, give relief or tend to lessen his period of disability.
19. Plaintiff's average weekly wage on the relevant dates was $717.08, which results in a compensation rate of $478.08.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage on the relevant dates was $717.08, which results in a compensation rate of $478.08. N.C. Gen. Stat. § 97-2(5).
2. On January 29, 2003, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6). As the direct and natural result of, and causally related to her January 29, 2003 injury by accident, Plaintiff sustained an injury to his back that eventually required two surgeries. Id.
3. A Form 60, which was filed in this case, constitutes an award of the Industrial Commission as to the issue of compensability but does not create a presumption of disability. N.C. Gen. Stat. § 97-82 (b); Sims v.Charmes/Arby's Roast Beef, 142 N.C. App. 154 (2001).
4. Plaintiff has met his burden of proof and has demonstrated by a preponderance of the credible evidence, the existence of his disability and the extent of that disability. Plaintiff has been incapable subsequent to his injury of January 29, 2003, of earning wages in any competitive employment. His incapacity to earn was caused by his work-related accident and injury. Morrison v. Burlington Industries,304 N.C. 1, 282 S.E.2d 458 (1981); see also Hensley v. IndustrialMaintenance Overflow, 166 N.C. App. 413, 418, 601 S.E.2d 893, 897
(2004) (`[T]he test for determining whether the self-employed injured employee has wage-earning capacity is that the employee (i) be actively involved in the day to day operation of the business and (ii) utilize skills which would enable the employee to be employable in the competitive market place notwithstanding the employee's physical limitations, age, education and experience. In the instant case, given plaintiff's exertional limitations, education, and experience, would he be hired to work in the competitive market place[.]').
5. Based on the greater weight of the evidence, visiting drilling sites while mostly standing around and talking to the property owners about divining rods on one or two occasions, going to Lowe's to pick concrete for delivery on one occasion, and driving his truck to pull another truck out of the mud on one occasion, are not indicative of a return to wage earning capacity.
6. The record does not reflect that Plaintiff has reached maximum medical improvement as a result of his compensable injury, and has been able to return to work with Defendant-Employer or in any other type of work that Plaintiff is vocationally suited. N.C. Gen. Stat. § 97-29.
7. Plaintiff is entitled to continuing medical benefits which may tend to effect a cure, give relief or lessen his period of disability. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff total disability compensation at the rate of $478.08 per week from January 29, 2003 and continuing until he returns to work or until it is otherwise ordered by the Industrial Commission, subject to Defendants' credit for compensation already paid. This compensation is also subject to the attorney fees approved herein.
2. Defendants shall pay for all reasonably required medical treatment incurred or to be incurred by Plaintiff as the result of his January 29, 2003 injury by accident, when bills for the same are submitted and approved according to procedures approved by the Commission.
3. Twenty-five percent of the accrued compensation awarded Plaintiff in paragraph 1 of this AWARD is approved as a fee for Plaintiff's attorney and shall be deducted and paid directly to Plaintiff's attorney; thereafter, Plaintiff's attorney shall receive every fourth check.
4. Defendants shall pay the costs.
This the __ day of _______________ 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_________________ DIANNE C. SELLERS COMMISSIONER
 S/_________________ THOMAS J. BOLCH COMMISSIONER